## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Case No. 1:26-cv-00256

RYAN MILLER, Petitioner,

v.

MOSES STANCIL, Executive Director, Colorado Department of Corrections, and DAVE BERGMAN, Warden, Arkansas Valley Correctional Facility, Respondents,

    and

PHILLIP J. WEISER, Attorney General, State of Colorado, Additional Respondent.

_____

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TO 28 U.S.C. § 2254 AND SUPPORTING ARGUMENT
_____

Petitioner, Ryan Miller, through his undersigned counsel, respectfully submits this petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254 and the supporting legal and factual arguments that follow, and asks this Court to issue the Great Writ to vacate his convictions and grant him a new trial due to violations of his federal constitutional rights, as detailed herein.

*/s/ Jonathan D. Reppucci*

Jonathan D. Reppucci
Reppucci Law Firm, P.C.
1544 Race St.
Denver, CO 80206
Telephone: (303) 333-5166
Email: jiccupper@gmail.com

Attorney for Petitioner

i

# TABLE OF CONTENTS

APPENDIX LIST ................................................................................................................ iv

JURISDICTION ................................................................................................................. 5

CONVICTIONS UNDER REVIEW .................................................................................. 5

PROCEDURAL HISTORY ............................................................................................... 6

   Direct Appeal .............................................................................................................. 6

   Postconviction Proceedings ........................................................................................ 7

GENERAL CONSIDERATIONS ...................................................................................... 9

   I.  Successiveness ....................................................................................................... 9

   II.  Timeliness ............................................................................................................. 9

   III. Exhaustion of State Remedies ........................................................................... 11

   IV.  Standards for Habeas Relief ............................................................................... 11

CLAIMS FOR RELIEF, INCLUDING PERTINENT FACTS AND SUPPORTING ARGUMENT ................................................................................................................... 13

   I.  CLAIM ONE:  Mr. Miller is entitled to habeas relief because his Sixth Amendment right to effective assistance of counsel was violated when his trial attorney failed to move to suppress the prejudicial fruits of an illegal search under the Fourth Amendment .............. 13

      A.   Background / Supporting Facts .................................................................. 13

      B.   Relevant State Court Proceedings and Last Reasoned Decision: *Miller II* .................. 14

      C.   Merits ........................................................................................................ 15

         1.   Miller's trial attorneys' failure to move to suppress the evidence found in the backpack search is a textbook example of ineffective assistance of counsel under *Strickland* and *Kimmelman*. .................................................................. 15

            a.   The warrantless backpack search exceeded the bounds of *Terry* ........................... 15

            b.   The warrantless backpack search was unconstitutional, and hence the backpack evidence excludable, because the officer could not have reasonably believed that Leavitt had authority to consent to the search. ........................................ 17

            c.   Miller's trial counsel's failure to move to suppress the evidence found in the search on Fourth Amendment grounds was deficient. ........................................ 21

      d.   Miller's trial counsel's failure to move to suppress the evidence found in the search on constitutional grounds was prejudicial. ............................................................. 22

D.   AEDPA Review ........................................................................................... 24

   1.   No Merits Adjudication ...................................................................... 24

   2.   Contrary To ........................................................................................ 26

   3.   Unreasonable Application.................................................................... 28

   4.   Unreasonable Fact-Finding ................................................................ 29

E.   Need for Evidentiary Hearing .................................................................... 31

F.   Conclusion................................................................................................. 32

II. CLAIM TWO:  Mr. Miller is entitled to habeas relief because his federal constitutional rights to due process and a fair trial were violated by pervasive prosecutorial misconduct during the trial and throughout closing argument. .............................................................. 32

A.   Preservation and Last Reasoned State Court Decision: *Miller I* .................................. 32

B.   Additional Relevant Facts from Direct Appeal ........................................................... 33

   1. Asserting in rebuttal closing argument that Miller was "lying all day.  Lying, lying, lying…" and "can't keep it all straight." .................................................................... 33

   2. Improperly asking a witness about invoking the Fifth Amendment and being "forced" to testify, improperly characterizing Miller's demeanor at counsel's table and using it as substantive evidence of guilt, misrepresenting the terms of the witness's immunity agreement, and opining that the witness "lie[d] and perjure[d] himself." .................. 34

   3. Improperly bolstering Leavitt's testimony in rebuttal closing with facts not in evidence. .................................................................................................... 36

   4. Misrepresenting evidence, misleading the jury, and encouraging jurors to draw improper inferences. .................................................................................... 37

   5. Seeking to inflame sympathy for the victim and improperly calling her "brave" and "courageous" for accusing Miller.................................................................... 38

   6. Shifting the burden to prove the defense theory and implying it was brought in bad faith.......................................................................................................... 38

   7. Cumulative effect of the misconduct.......................................................... 39

C.   Legal Discussion ....................................................................................... 40

D.   Harmful Error under *Brecht* ....................................................................... 47

E.   Conclusion................................................................................................. 48

# APPENDIX LIST

Appendix 1:    Original Judgment & Mittimus dated 6/10/13

Appendix 2:    Second Amended Opening Brief, No. 13CA1371, dated 2/4/16

Appendix 3:    Reply Brief, No. 13CA1371, dated 4/25/17

Appendix 4:    *People v. Miller*, No. 13CA1371 (Colo. App. Sept. 21, 2017) (unpublished) (*Miller I*)

Appendix 5:    Petition for Certiorari, No. 17SC769, dated 2/6/18

Appendix 6:    Motion for Appointment of Counsel and for Postconviction Relief under Colo. Crim. P. 35(c), No. 11CR5114, dated 1/17/19

Appendix 7:    Order Denying Crim. P. 35(c) Motion, No. 11CR5114, dated 7/23/19

Appendix 8:    Pro Se Opening Brief, No. 19CA1456, dated 2/21/20

Appendix 9:    Reply Brief, No. 19CA1456, dated 10/1/20

Appendix 10:  *People v. Miller*, No. 19CA1456 (Colo. App. Aug.5, 2021) (unpublished) (*Miller II*).

Appendix 11:  Motion to Correct an Illegal Sentence under Colo. Crim. P. 35(a) dated 4/8/22

Appendix 12:  Second Motion for Postconviction Relief under Colo. Crim. P. 35(c), No. 11CR5114, dated 8/11/22

Appendix 13:  Order Granting Crim. P. 35(a) Motion, No. 11CR5114, dated 9/12/22

Appendix 14:  Amended Judgment & Mittimus dated 9/12/22

Appendix 15:  *People v. Miller*, No. 23CA0625, 2025 WL 1078966 (Colo. App. Apr. 10, 2025) (unpublished) (*Miller III*)

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2254 and 1331.

## CONVICTIONS UNDER REVIEW

In Case No. 11CR5114 in the District Court of Denver County, Colorado, the State of Colorado charged Mr. Miller by complaint and information with Count 1, first-degree murder under C.R.S. § 18-3-102(1)(a), a class one felony.[1] CF, pp.15-16.[2] The State later added additional charges for: second-degree kidnapping under C.R.S. § 18-3-302(1), a class four felony (Count 2); first-degree burglary (assault) under C.R.S. § 18-4-202(1), a class three felony (Count 3); and third-degree assault under C.R.S. § 18-3-204(1)(a), a class 1 misdemeanor (Count 4). CF, pp.26-27.

On the morning of December 16, 2011, the murder victim A.R., Miller's former girlfriend, was found dead in her car, killed by a single gunshot. Desiree Santerre — the *only* witness with a good opportunity to see the shooting suspect — described a man without facial hair, wearing dark clothing and a brown hat who ran to a silver Audi and got into the driver's side. TR 4/11/13, pp.111-17, 138-41, 145-46. That description did not match Miller, who at that time had a "scruffy beard." CF, pp.214-15; TR 4/16/13, p.80:1-19; TR 4/19/13 pp.31-33; Exhibits, pp.40-4 (2/17/12 PH PPL Ex.21). But it did match his co-defendant, Richard Leavitt, who not only owned a silver Audi and was wearing a brown hat when contacted by Denver

---

[1] Citations to state statutes hereinafter are to the Colorado Revised Statutes (C.R.S.) in effect at the time of Mr. Miller's prosecution, direct appeal and postconviction proceedings, unless otherwise indicated.

[2] Citations to the state court record are to the court file (CF), transcripts by date (TR _/__/__), and exhibits, as prepared as the records on appeal in Miller's state court appeals, most recently in *People v. Miller*, 23CA625.

Police Department ("DPD") officers shortly after the murder, but also put himself and his Audi at the murder scene.  TR 4/11/13, pp.125-27, 272-73, 276:11-22; TR 4/12/13, pp.30:3-11, 156-59; TR 4/15/13 pp.61:14-17, 88-89, 100-111; TR 4/16/13, pp.8-9; CF, pp.88-89, 216-19, 319.

Miller pled not guilty and has always maintained his innocence, that he was wrongfully convicted, and that Leavitt, acting alone, committed the murder.  *See*, *e.g.*, CF, p.421.

Following a nine-day trial, a jury convicted Miller on all counts, including criminal trespass to dwelling under C.R.S. § 18-4-502(1)(a), a class 5 felony (Count 5), as a "lesser non-included" offense of burglary.  TR 4/18/13, pp.54-55, 124, 142, 161-62; TR 4/19/13, pp.81-85. On June 10, 2013, the state trial court sentenced him to life without parole on Count 1, six years consecutive on Count 2, twelve years consecutive on Count 3, two years consecutive on Count 4,[3] and three years to run consecutive to Count 2 but concurrent to Count 3 on Count 5.  CF, pp.453-54 (Original Judgment & Mittimus dated 6/10/13, provided at Appendix 1); TR 6-10-13, pp.32-33.

## PROCEDURAL HISTORY

### Direct Appeal

Miller appealed the judgment to the Colorado Court of Appeals ("CCOA"), asserting, *inter alia*, federal due process errors based on prosecutorial misconduct during his trial and in closing argument.  *See* Second Amended Opening and Reply Briefs (Appendices 2 & 3, respectively).  The CCOA affirmed the judgment on direct appeal, concluding that none of the errors warranted relief under plain error standards, without addressing the constitutional basis of

---

[3] The court determined that this misdemeanor sentence was to be served first and within the Department of Corrections.  TR 6-10-13, p.32-33; CF, p.448.

his claims.  *See People v. Miller*, No. 13CA1371 (Colo. App. Sept. 21, 2017) (not published

pursuant to C.A.R. 35(f)) (*Miller I*) (Appendix 4).

Miller petitioned the Colorado Supreme Court ("CSC") to issue a writ of certiorari to

review the CCOA's decision, again asserting federal due process claims based on prosecutorial

misconduct.  *See* Petition for Certiorari (Appendix 5).  The CSC denied his petition.  *See Miller

v. People*, No. 17SC769, 2018 WL 2297106 (Colo. May 21, 2018).  Miller did not petition the

Supreme Court of the United States to issue a writ of certiorari.

**Postconviction Proceedings**

Indigent and pro se, on January 17, 2019, Miller filed a motion for postconviction relief

under Colo. Crim. P. 35(c) in the Denver District Court and requested the appointment of

counsel.  CF, pp.532-66 (Appendix 6).  His postconviction motion alleged various constitutional

errors, including, *inter alia*, violations of his Sixth Amendment rights to effective assistance of

counsel, and his Fourteenth Amendment rights to due process and a fundamentally fair trial.  As

pertinent here, Miller asserted that his trial counsel was ineffective for failing to move to

suppress evidence found in DPD's search of his backpack when it was in Leavitt's possession,

on Fourth Amendment grounds.  CF, pp.536-46.

The state postconviction court denied Miller's motion in a written order on July 23, 2019,

without granting him access to his transcripts, appointing him counsel, or conducting an

evidentiary hearing.  CF, pp.573-88 (Appendix 7).

Pro se still, Miller appealed that order.[4]  His briefing presented his ineffective assistance

of counsel claims and argued that the postconviction court had erred in summarily denying his

---

[4] Undersigned counsel did not appear on Miller's behalf in the CCOA until the reply brief stage.

claims without affording him any meaningful opportunity to actually prove them. *See* Opening and Reply Briefs (Appendices 8 & 9, respectively). The CCOA affirmed the state postconviction court's order in another unpublished decision, concluding, *inter alia*, as relevant here, that: the backpack search did not violate the Fourth Amendment because (based only on the existing record), in the CCOA's view, it "didn't exceed the permissible scope of the protective search" under *Terry v. Ohio*, 392 U.S. 1 (1968). *See People v. Miller*, No. 19CA1456, ¶¶ 13-27 (Colo. App. Aug. 5, 2021) (not published pursuant to C.A.R. 35(f)) (*Miller II*) (Appendix 10). The CSC denied certiorari. *See Miller v. People*, No. 21SC684, 2022 WL 103368 (Colo. Jan. 10, 2022).

On April 8, 2022, Miller filed a motion to correct an illegal sentence under Colo. Crim. P. 35(a) in the Denver District Court, focusing on the sentence imposed on Count 5 for first-degree criminal trespass. CF, pp.674-76 (Appendix 11). While this postconviction motion was spending, Miller filed a second Crim. P. 35(c) motion on August 11, 2022, setting forth postconviction claims of newly discovered evidence and constitutional error based on (1) the prosecution's presentation of unreliable and misleading evidence and (2) deprivation of due process and fair notice of the charges against him. CF, pp.687-728 (Appendix 12).

On September 12, 2022, the district court granted Miller's 35(a) motion and vacated the three-year sentence imposed on Count Five, concluding that because first-degree criminal trespass is actually a lesser-*included* offense of first-degree burglary, the conviction for the former merged into the latter and, therefore, the corresponding sentence was not authorized by law. CF, pp.729-33 (Appendix 13). The court issued an amended judgment and mittimus the same day. CF, pp.734 (Appendix 14). On February 27, 2023, however, the court denied Miller's second 35(c) motion, without conducting an evidentiary hearing, concluding that "the

Motion, the files, and record clearly establish that the Defendant is not entitled to relief."  CF, pp.738-46.  Miller appealed this order to the CCOA, which affirmed the order in another unpublished decision.  *See People v. Miller*, No. 23CA0625, 2025 WL 1078966 (Colo. App. Apr. 10, 2025) (not published pursuant to C.A.R. 35(f)) (*Miller III*) (Appendix 15).  The CSC again denied certiorari.  *See Miller v. People*, No. 25SC299, 2025 WL 2649231 (Colo. Sept. 15, 2025).

Miller remains in the custody of the Colorado Department of Corrections at the Arkansas Valley Correctional Facility, 12750 Highway 96, Ordway, CO 81034.  He is serving the sentences imposed as a result of the judgment of conviction in this case.  He has no concurrent or future sentences to be served after he completes the current sentences.

## GENERAL CONSIDERATIONS

### I.    Successiveness

Miller has not previously filed any actions in federal court challenging the judgment or sentences in this case.

### II.    Timeliness

Miller was required to file his habeas corpus petition within one year after his convictions became final on direct appeal.  *See* 28 U.S.C. § 2244(d)(1)(A).  "The time during which a properly filed application for State Postconviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" this one-year limitation period.  28 U.S.C. § 2244(d)(2).  The Supreme Court has defined "collateral review" as "judicial review that occurs in a proceeding outside of the direct review process."  *Wall v. Kholi*, 562 U.S. 545, 560 (2011) (holding that a motion to reduce sentence filed under Rhode Island state Rule 35 tolled the one-year limitation).  A "properly filed" application is one filed according to the filing

requirements for a motion for state postconviction relief. *Habteselassie v. Novak*, 209 F.3d 1208, 1210-11 (10th Cir. 2000).

In this case, the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1) began to run on August 20, 2018, the first day after the time (90 days) for petitioning for a writ of certiorari in Supreme Court of the United States expired.  One hundred and fifty (150) days then passed before Miller properly filed his first motion for postconviction relief under Colo. Crim. P. Rule 35(c) on January 17, 2019.  CF, pp.536-66 (Appendix 6).  This filing tolled the one-year statute of limitations until the CSC issued it decision denying Miller's related petition for a writ of certiorari on January 10, 2022.  The limitations clock began to run again on January 11, 2022.

Eighty-seven (87) more days passed before Miller properly filed his Colo. Crim. P. 35(a) motion to correct the sentence on Count 5 on April 8, 2022.  CF, pp.674-76 (Appendix 11).  This filing again tolled the one-year statute of limitations set forth in 28 U.S.C. § 2244(d)(1) throughout the time period it took to resolve his 35(a) motion and his second Colo. Crim. P. 35(c) motion (Appendix 12) (which, as noted, was filed before the state postconviction court granted his 35(a) motion).  *See*, *e.g.*, *King v. Miller*, 611 F. App'x 486, 491 (10th Cir. 2015) (petitioner's filing of a Rule 35(a) motion "tolled the limitations period" under § 2244(d)(1)(A)). The one-year statute of limitations remained tolled until the CSC issued it decision denying Miller's related petition for a writ of certiorari, which had the effect of finally denying Miller's remaining postconviction claims, on September 15, 2025.

The one-year statute of limitations began to run again on September 16, 2025.  Because two hundred and thirty-seven (237) days had previously expired on the one-year statute, one hundred and twenty-eight (128) days remained before the statute of limitations would expire.

Accordingly, the final day of the one-year statute of limitations is January 22, 2026, and this petition is timely filed under 28 U.S.C. § 2244(d)(1).

## III.    Exhaustion of State Remedies

In order to seek federal habeas corpus relief, a state prisoner must first exhaust all state court remedies. *See* 28 U.S.C. § 2254(b)(1)(A); *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994).

Miller exhausted the constitutional claims set forth herein within the state court system, either on direct review or postconviction review, and fairly presented his claims to the CCOA (and to the CSC, which declined to hear them). The facts demonstrating exhaustion of each claim are set forth as necessary in the substantive sections below. Accordingly, there should be no procedural bar to this petition for relief.

## IV.    Standards for Habeas Relief

The Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the framework to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions, and governs this Court's review. In conducting habeas review of a state court decision, federal courts look to "the last reasoned opinion on the claim." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Consideration of habeas challenges is deferential to the state courts when they reject claims on the merits. When a claim has been adjudicated on the merits in a state court, a federal court can grant habeas relief if the state court's resolution was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

11

A state court decision is contrary to clearly established Supreme Court precedent if it reaches a legal conclusion opposite the Supreme Court's or concludes differently on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 406 (2000). A state court unreasonably applies clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case," or extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Id.* at 407-09.

Importantly for this case, by its terms, the restrictions of § 2254(d) apply *only* to federal constitutional claims that were "adjudicated on the merits in State court proceedings." Where a claim has not been "adjudicated on the merits" in state court, no deference to the state court decision under § 2254(d) is required, and instead this Court must exercise its "independent judgment" and review the claims and the district court's legal conclusions *de novo*. *See*, *e.g.*, *Byrd v. Workman*, 645 F.3d 1159, 1166 (10th Cir. 2011).

Thus, if this Court determines (1) that the CCOA did not adjudicate the merits of all of Miller's claims, or (2) that the CCOA's decision on any of the claims adjudicated on the merits was contrary to, or involved an unreasonable application of, clearly established Federal law, and/or (3) that the CCOA's decision was based on an unreasonable determination of the facts in light of the evidence, then it must review such claims *de novo*. *See* § 2254(d).

In a habeas proceeding arising from a state court judgment, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1).

## CLAIMS FOR RELIEF, INCLUDING PERTINENT FACTS
## AND SUPPORTING ARGUMENT

**I.    CLAIM ONE:  Mr. Miller is entitled to habeas relief because his Sixth Amendment right to effective assistance of counsel was violated when his trial attorney failed to move to suppress the prejudicial fruits of an illegal search under the Fourth Amendment.**

**A.    Background / Supporting Facts**

Shortly after the crime, DPD stopped the co-defendant Leavitt, after observing him exit the rear of Miller's apartment building.  Leavitt was wearing a brown hat and moving quickly towards a silver Audi.  CF, pp.3, 542; TR 4/12/13, pp.30-31, 158-59.  After checking Leavitt's identification and patting him down for weapons, the officers asked for his consent to search the backpack he was carrying.  Leavitt told the officers that the backpack was not his and belonged to Ryan Miller, but otherwise consented to the search.  CF, pp.89, 198-99, 203-04, 208-09, 443; TR 4/10/13, pp.165-66; TR 4/12/13, pp.19-27, 30-32, 37-45, 48.

DPD searched the backpack and found two plastic baggies stuffed inside a pair of sneakers.  One baggy/shoe contained a magazine for a semi-automatic handgun; the other contained a semi-automatic handgun.  TR 4/10/13, p.166; TR 4/12/13 p.44.  Subsequent forensic testing confirmed that the gun was the murder weapon and indicated that both Leavitt's and Miller's DNA was present on the gun.  CF, pp.198-99, 203-04; TR 4/17/13, pp.25-40 (matching shell casing from the scene to ammunition found in Leavitt's Audi and the cartridge case and gun recovered from the backpack); 56-65 (collecting samples from the sneakers and gun for DNA analysis); 87-100 (DNA analysis finding DNA mixtures on (a) the sneakers which included Miller as a possible contributor, but was inconclusive when compared to his profile, and (b) the gun, which matched both Miller and Leavitt).

Prior to the trial, Miller's lawyers never moved to suppress the backpack evidence as the fruits of an illegal search. During the trial, the prosecution introduced the backpack evidence and the derivative ballistics and DNA evidence, and relied heavily on that evidence to make its case against Miller.

### B.    Relevant State Court Proceedings and Last Reasoned Decision: *Miller II*

Miller alleged in his initial pro se Crim. P. 35(c) postconviction motion (and sought the appointment of counsel to help demonstrate) that his trial lawyers were ineffective for failing to challenge the constitutionality of DPD's warrantless backpack search. CF, pp.532-47 (Appendix 6). The state postconviction court denied this claim without affording Miller representation or an evidentiary hearing, concluding that the evidence from the trial "establishes the officers' objective, reasonable belief" that Leavitt had authority or apparent authority to consent to the search and, furthermore, that Miller had "abandoned the backpack when he instructed" Leavitt to destroy the backpack and its contents. CF, pp.576-79 (Appendix 7). The court thus determined that Miller had failed "to prove that the suppression claim is meritorious and there is a reasonable probability that the verdict would have been different absent the excludable evidence," and he therefore had not established deficient performance and prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). CF, pp.578-79.

Miller thereafter presented his ineffective assistance claim to the CCOA, arguing that the backpack evidence was excludable because Leavitt had neither actual nor apparent authority to consent to the search given his express denial that the backpack belonged to him (Appendices 8 & 9). The CCOA did not address the merits of the claim Miller actually raised, but rather affirmed on different grounds, ostensibly "supported by the record." *Miller II*, ¶¶ 13-27. Specifically, the CCOA found that "the search of Miller's backpack didn't exceed the

permissible scope of the protective search because the officers had reasonable suspicion to believe that it contained a weapon to which [Leavitt] had access." *Id.* Because it thus concluded that the backpack search did not violate the Fourth Amendment, the CCOA did not apply *Strickland* and made no express findings on either *Strickland* prong. Neither *Strickland* nor *Kimmelman v. Morrison*, 477 U.S. 365 (1986), is even once mentioned in the CCOA's entire discussion of the issue presented. *See id.*, ¶¶ 13-27 (portion of *Miller II* pertaining to Miller's ineffective assistance claim based on counsel's failure to seek suppression of evidence obtained from the backpack; no mention of either *Strickland* or *Kimmelman*). Indeed, the *Miller II* court completely disregarded *Kimmelman*, which is not cited throughout the entire opinion.

Miller petitioned the CSC for a writ of certiorari on this claim, but the CSC denied the petition. Therefore, the *Miller II* is the last reasoned state court decision to dispose of these federal claims.

### C.    Merits

1.    **Miller's trial attorneys' failure to move to suppress the evidence found in the backpack search is a textbook example of ineffective assistance of counsel under *Strickland* and *Kimmelman*.**

a.    **The warrantless backpack search exceeded the bounds of *Terry*.**

The Fourth Amendment to the United States Constitution established the right to be free from unreasonable searches and seizures. U.S. Const. Amend. IV. Warrantless searches are *per se* unreasonable, barring certain recognized exceptions. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 382 (2014). One such exception allows police officers — during an investigatory stop founded on reasonable suspicion that a crime is being, has been, or is about to be committed — to frisk a detained person for weapons if the officers have an articulable suspicion that the person

is both armed and a danger to the safety of officers or others. *Terry*, 392 U.S. at 30. Under this limited exception, a police officer who, during a lawful investigatory stop reasonably suspects that the person being investigated is "armed and presently dangerous to the officer or to others," may "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him" and thereby "neutralize the threat of physical harm." *Id.* at 24, 30. "This limited protective search includes a *pat-down* of the suspect's effects, including a bag." *U.S. v. Leo*, 792 F.3d 742, 749 (7th Cir. 2015) (emphasis added).

"The reasonableness of a search is evaluated 'on the basis of the facts as they existed at the time' of the search." *Id*. at 750, quoting *U.S. v. Jacobsen*, 466 U.S. 109, 115 (1984), and citing *Terry*, 392 U.S. at 21-22. Here, because Miller's attorneys never moved to suppress the backpack search, no suppression hearing ever occurred. Consequently, the totality of the circumstances surrounding the search and the facts as they existed at the time of the search were never presented or precisely determined. The state trial court record, however, does *not* establish that the DPD officers had *any* belief, much less a reasonable one, that Leavitt was "presently dangerous" or that he could "gain immediate control of weapons" in the backpack once the officers took possession of it, as would be constitutionally required to search it. *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (emphasizing that search of a car was lawful because police had a reasonable belief that the suspect was dangerous and may have been able to "gain immediate control of weapons"). After all, when police opened and searched the backpack, Leavitt was already subdued and fully compliant. The officers had already frisked him and found no weapons. They had taken his means of identification, and they had separated him from the backpack such that it was no longer in his possession. He was sitting on the ground and

16

being closely watched.  TR 4/12/13, pp.21-26, 36-45.  Thus, even if the officers believed the backpack *might* contain weapons, they had already disarmed Leavitt, such that there was no present "threat of physical harm" to them or anyone else.  Indeed, there is no evidence in the record that anyone else was even present, much less in harm's way.

The reality is that, in the case at bar, the police did not conduct a "limited pat-down search" of the backpack or even ask to do so.  Instead, they asked Leavitt to consent to allowing them to look inside the backpack.  The search of the backpack, therefore, wasn't justified under *Terry*, but rather was a search of evidence of a crime and, as such, exceeded the bounds of *Terry*. *See Leo*, 792 F.3d at 749-50; *U.S. v. Wills*, 316 F.Supp.3d 437, 445 (D.D.C. 2018) ("Absent exigent circumstances, a permissible frisk of a bag or backpack *must begin* with an exterior pat-down of the bag or backpack; only if an officer plainly feels an item that is immediately recognizable as a weapon or other contraband may any further search or seizure be reasonable.") (emphasis added).  This case is on almost all fours with *Wills*, which held that where the officer failed to "first pat down the exterior of the backpack to feel for weapons" and instead "immediately unzipped" the backpack and "conducted a full-scale search of its contents," the officer "conducted a warrantless search that clearly 'exceeded the bounds of *Terry*.'"  *Wills*, 316 F.Supp.3d at 444-45, citing *Leo*, 792 F.3d at 749-50.

> **b.** **The warrantless backpack search was unconstitutional, and hence the backpack evidence excludable, because the officer could not have reasonably believed that Leavitt had authority to consent to the search.**

Because the backpack search cannot be justified under *Terry*, the real question at the heart of this case is and has always been whether Leavitt had authority to consent to the search of a backpack, even though he clearly stated that it didn't belong to him and may have even told the

police at that time that it belonged to Miller.

As noted, warrantless searches and seizures are presumptively invalid unless justified by an established exception to the warrant requirement.  Another such exception is valid consent to search, which may be "obtained, either from the individual whose property is searched, or from a third party who possesses common authority over" the property.  *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), and *U.S. v. Matlock*, 415 U.S. 164, 171 (1974).  The "common authority" inquiry includes those instances in which a police officer reasonably believes, under an objective test, that a third party had the authority to consent to a search.  *Rodriguez*, 497 U.S. at 188-89.  Notably, however:

> the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry.  As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment … 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?  If not, then warrantless entry without further inquiry is unlawful unless authority actually exists.

*Id*., quoting *Terry*, 392 U.S. at 21-22.

"For purposes of searches of closed containers" such as a backpack, "mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents."  *U.S. v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000), citing *U.S. v. Karo*, 468 U.S. 705, 726 (1984) (O'Connor, J., concurring).  When police find themselves in ambiguous circumstances regarding the authority of the third party to consent to the search or are "presented with ambiguous facts related to authority," they have "a duty to investigate further before relying on the consent."  *U.S. v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007), quoting *U.S. v. Kimoana*, 383 F.3d 1215, 1221 (10th Cir. 2004).

The government bears the burden of establishing that the consenting party had authority or common authority, which is a factual question. *Cos*, 498 F.3d at 1194; *see also U.S. v. James*, 353 F.3d. 606, 613 (8th Cir. 2003). Here, as explained above, the backpack search exceeded permissible bounds of a *Terry* search. Therefore, the Fourth Amendment required the officers either to obtain valid consent to search the backpack or "obtain a warrant before examining the contents of such a package." *Jacobsen*, 466 U.S. at 114; *U.S. v. Place*, 462 U.S. 696, 701 (1983). The DPD officers did neither.

By the government's own theory, the backpack belonged to Miller, not Leavitt. TR 4/10/12, p.165. Miller therefore had a legitimate expectation of privacy in its contents. Indeed, a backpack is the type of container that historically has commanded a high degree of privacy. *See U.S. v. Salinas-Cano*, 959 F.2d 861, 864 (10th Cir. 1992); *Basinski*, 226 F.3d at 834-36 (collecting cases); *U.S. v. Chadwick*, 433 U.S. 1, 13 (1977). Accordingly, had Miller's trial counsel moved to suppress the backpack search, the issue would have been the validity of Leavitt's consent to permit the search.

The officers could not have had a reasonable belief that Leavitt had actual authority to consent to a search of the backpack, given that he expressly denied that it belonged to him and indicated it belonged to Miller. Resolution of the issue, therefore, necessarily would have turned on whether the prosecution could have established apparent authority. But this "burden cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." *Salinas-Cano*, 959 F.2d at 864, quoting *U.S. v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991).

At the time Leavitt purported to consent to the search, the officers knew only that: there was a restraining order in place which prohibited Miller from contacting the victim and thus he

was potentially a murder suspect; Leavitt was seen leaving Miller's apartment building; Leavitt appeared visibly nervous when stopped; and Leavitt possessed a backpack, which he told the officers did not belong to him.  Under these circumstances, viewed objectively, the officers could not have had a reasonable belief that Leavitt had authority to consent to the backpack search, and they were clearly "on notice" that further inquiry was constitutionally required.  *See U.S. v. Jaras*, 86 F.3d 383, 389-90 (5th Cir. 1996); *see also Evans v. State*, 989 So.2d 1219, 1222 & n.3 (Fla. 5th DCA 2008) ("When a third party informs the officer that a closed container belongs to another person, it is not objectively reasonable for the officer, without making further inquiry, to search the container.").

Nor does the fact that Leavitt had possession of the backpack demonstrate that he had common authority over it.  *See Basinski*, 226 F.3d at 834 (quoted *supra*); *James*, 353 F.3d. at 614 ("A review of our case law and the law of other circuits shows that although a bailee of a concealed item may have potential physical access to the inner contents of the item …, this kind of access does not mean the bailee has actual authority to look at the contents of the items, or to consent to another's searching them.  Put another way, one does not cede dominion over an item to another just by putting him in possession."); *Matlock*, 415 U.S. at 171, n.7 ("Common authority is, of course, not to be implied from the mere property interest a third party has in the property.").

In sum, the evidence found in the backpack was uncovered in an illegal search and, therefore, subject to suppression as fruit of the poisonous tree.  *See Wong Sun v. U.S.*, 371 U.S. 471, 484 (1963) (the exclusionary rule generally prohibits the introduction of evidence at trial that is a derivative of an unconstitutional search and seizure); *Murray v. United States*, 487 U.S. 533, 537 (1988) (same); *Cos*, 498 at 1117 (affirming district court's suppression of evidence).

20

As in *Salinas-Cano*, 959 F.2d at 865-66, and *Whitfield*, 939 F.2d at 1073-74, the officer's mistake was of law, not of fact, and it was not objectively reasonable. *See Heien v. North Carolina*, 574 U.S. 54, 67 (2014) ("an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is dutybound to enforce").

> **c.    Miller's trial counsel's failure to move to suppress the evidence found in the search on Fourth Amendment grounds was deficient.**

The proper standard for assessing a claim of actual ineffectiveness of counsel is that set forth in *Strickland*. The petitioner must show both (1) constitutionally deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice, by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different. *Id*.

A criminal defense attorney's failure to make a meritorious Fourth Amendment objection to admission of evidence can amount to ineffective assistance of counsel. *See Kimmelman*, 477 U.S. at 382-83. To prevail, a petitioner must demonstrate that (1) his Fourth Amendment claim is meritorious, and (2) there is a reasonable probability that the verdict would have been different absent the excludable evidence. *Id.* at 374-75, 383-90, citing *Strickland*, 466 U.S. at 688-91, 694.

Here, as just discussed, a motion to suppress the illegal backpack search was highly meritorious. Yet the existing record does not reflect that Miller's lawyers ever identified or even considered raising the substantial Fourth Amendment issue, much less that they declined to do so for strategic reasons. Their failure to move to suppress, therefore, cannot be seen as a legitimate defense tactic or strategy. *See Kimmelman*, 477 U.S. at 384-85; *Joshua v. Dewitt*, 341 F.3d 430, 440 & n.2 (6th Cir. 2003). Assuming *arguendo* that it was a strategic decision, then it was

patently unreasonable.  *See Burns v. Gammon*, 260 F.3d 892, 897 (8th Cir. 2001).  There was nothing "to gain and everything to lose" by not moving to suppress the backpack evidence. *Kimmelman*, 477 U.S. at 382 n.7.  No reasonable lawyer would forgo competent litigation of a meritorious Fourth Amendment claim in this serious a case.  *Id.*

Under the circumstances presented, Miller's lawyers' failure to seek suppression of the backpack evidence was deficient performance and, indeed, forfeited compelling grounds for excluding this harmful evidence.  This was "a blunder of the first magnitude."  *Owens v. U.S.*, 387 F.3d 607, 608 (7th Cir. 2004); *see also Rosales v. Oliver*, No. 23-15081, 2025 WL 1248818, at *1-3 (9th Cir. 2025) (concluding that trial counsel's failure to move to suppress evidence (including a gun and a confession) derived from an illegal search based on unlawful entry fell below an objective standard of reasonableness under prevailing professional norms).

> **d.    Miller's trial counsel's failure to move to suppress the evidence found in the search on constitutional grounds was prejudicial.**

But for his lawyers' deficient performance, there is at least a reasonable probability that most of the key evidence in the prosecution's case, *i.e.*, the murder weapon and the derivative ballistics and DNA evidence, would have been suppressed, leaving Miller with a strong shot at acquittal.  *See*, *e.g.*, *Rosales*, *supra* at *3 ("The entry clearly was unlawful, and the resulting evidence – the gun and the confession – were key pieces of evidence in the prosecution's case," such that there was a reasonable probability that the result of the proceeding would have been different).  After all, the case against him was in no way ironclad.  He never confessed to police. He had a solid alibi that raised questions concerning the prosecution's timeline and his opportunity to commit the crime.  Eyewitness Desiree Santerre gave a physical description matching Leavitt, not Miller.  The only other scene witness, Richard Daulton, similarly described

the suspect as wearing a "beanie style … knit cap for winter," but didn't see the man's face.  TR 4/11/13, pp.149-51, 169-70.  Leavitt both owned the silver Audi and confessed that he and his car were at the murder scene.

Without the backpack evidence, Miller's defense would have been substantially stronger, and the case against him markedly weaker.  Prosecutors would not have had the murder weapon or any forensic or ballistics evidence tying Miller to the crime.  Instead, they would have been left with a shell casing from the scene that matched the ammunition found in the driver's side door of Leavitt's Audi (TR 4/12/13, p.174), a Chicago White Sox shirt recovered from the Audi containing DNA that matched Leavitt, but was inconclusive when compared to Miller's profile (Leavitt was from Chicago and was a White Sox fan, TR 4/15/13, pp.152-53), and inconclusive testing of the sweatpants recovered from the Audi.  TR 4/17/13, pp.87-100.  All of this evidence simply makes the case against Leavitt as the shooter that much stronger and the case against Miller that much weaker.

Without the DNA and ballistics evidence, prosecutors would have been forced to rely mostly on Leavitt's testimony and its motive evidence.  Leavitt's credibility was beyond poor. He plainly and admittedly had powerful motives to implicate Miller, and he had lied so frequently and continuously in order to benefit himself that prosecutors ultimately had to concede to the jury that he was a liar and "a despicable human being," while arguing that he had "finally" told the truth only once he was facing first-degree murder charges.  TR 4/15/13, pp.144-53, 169-79; TR 4/16/13, pp.4-23; TR 4/19/13 pp.69-71.

"The likely damage is best understood by taking the word of the prosecutor."  *Kyles v. Whitley*, 514 U.S. 419, 444 (1995).  Here, prosecutors told jurors that the gun was "the evidence that made all the difference in this case" and the derivative DNA evidence was "compelling to

23

say the least." TR 4/19/13, pp.59:8-11, 76:4-20. Thus, the backpack evidence "may have tipped the balance." *Kimmelman*, 477 U.S. at 390. Without it, there is a reasonable probability of a different outcome.

### D.    AEDPA Review

*Miller II* is the "last reasoned opinion on" Miller's *Kimmelman* claim. *See Nunnemaker*, 501 U.S. at 797. This Court should not give § 2254(d) deference to *Miller II*'s treatment of this claim for numerous reasons. First and foremost, the CCOA never actually addressed the merits of the claim. Under the AEDPA, if there has been no adjudication on the merits, federal courts review the claim *de novo*. *See, e.g.*, *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) ("if the state court did not decide the claim on the merits, and the claim also is not otherwise procedurally barred, we address the issue de novo and § 2254(d)(1) deference requirement does not apply."). Section 2254(d) deference also should not be given because the CCOA's decision with respect to the *Kimmelman* claim was contrary to and involved an unreasonable application of clearly established federal law as articulated in *Kimmelman* and *Strickland*, and it was also an unreasonable determination of the facts under *Strickland* and *Massaro v. U.S.*, 538 U.S. 500 (2003), and in light of the evidence presented in the state court proceedings. Each of these points is addressed in turn below.

### 1.    No Merits Adjudication

Although the CCOA cited *Strickland* at the outset as generally establishing "the test" for ineffective assistance of counsel claims and as not requiring a court to determine the prejudice prong if it determines that counsel's performance wasn't constitutionally deficient, *see Miller II*, ¶¶ 5, 8, it never applied the *Strickland* test to Miller's claim. Nor did it identify, cite, or purport to apply *Kimmelman*. Indeed, rather than addressing Miller's Sixth Amendment ineffective

assistance of counsel claim as it relates to the backpack search, the CCOA instead addressed only the underlying Fourth Amendment claim, which it rejected based on its conclusion that the search was permissible under *Terry*. *See Miller II*, ¶¶ 13-27. But, as the Supreme Court made clear in *Kimmelman*, Sixth and Fourth Amendment claims "have separate identities and reflect different constitutional values." *Kimmelman*, 477 U.S. at 374-75.

That the CCOA reached its decision on Fourth Amendment grounds without ever conducting any Sixth Amendment analysis demonstrates unequivocally that the CCOA did not reach the Sixth Amendment question presented. Therefore, any presumption that the CCOA adjudicated the Sixth Amendment claim on its merits is rebutted. *See Harrington v. Richter*, 562 U.S. 86, 99-100 (2011) (presumption that a state court "'adjudicated [a constitutional claim] on the merits' may be overcome when there is reason to think some other explanation for the state court's decision is more likely"), citing *Nunnemaker*, 501 U.S. at 803; *Johnson v. Williams*, 568 U.S. 289, 302-03 (2013) ("If a federal claim is rejected as a result of sheer inadvertence, it has not been evaluated based on the intrinsic right and wrong of the matter.… When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge.").

Accordingly, because the *Kimmelman* claim was presented but not adjudicated in the state court, no § 2254(d) deference should be applied to the CCOA's Opinion in *Miller II* as it pertains to this claim. This Court should instead exercise its independent judgment in deciding the *Kimmelman* claim, entitling Miller "to an unencumbered opportunity to make his case before a federal judge." *Johnson*, 568 U.S. at 303; *see also Hooks v. Workman*, 689 F.3d 1148, 1163-64 (10th Cir. 2010).

### 2.    Contrary To

*Strickland* clearly established that "the proper standard for judging attorney performance

is that of reasonably effective assistance … considering all the circumstances."  466 U.S. at 687-

88.  Under *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from counsel's
> perspective at the time….
>
> Thus a court deciding an actual ineffectiveness claim must judge the reasonableness
> of counsel's challenged conduct on the facts of the particular case, viewed as of the
> time of counsel's conduct.  A convicted defendant making a claim of ineffective
> assistance must identify the acts or omissions of counsel that are alleged not to have
> been the result of reasonable professional judgment.  The court must then determine
> whether, in light of all the circumstances, the identified acts or omissions were
> outside the wide range of professionally competent assistance.

*Id*. at 689-90.

*Kimmelman* clearly established that failure to make a meritorious Fourth Amendment

objection to admission of evidence can amount to ineffective assistance of counsel.  To prevail

on such a claim, a petitioner must demonstrate that (1) his Fourth Amendment claim is

meritorious, and (2) there is a reasonable probability that the verdict would have been different

absent the excludable evidence.  477 U.S. at 374-75, 383-90, citing *Strickland*, 466 U.S. at 688-

91, 694.

*Miller II* is "contrary to" both *Strickland* and *Kimmelman*.  Although Miller did his part

by identifying the "omissions of counsel that are alleged not to have been the result of reasonable

professional judgment," *Strickland*, 466 U.S at 690, the CCOA did not do its part.  It did not

determine "whether, in light of all the circumstances, that identified omission was outside the

wide range of professionally competent assistance."  In fact, the CCOA did not follow or apply

26

either *Strickland* or *Kimmelman* in denying Miller's *Kimmelman* claim.  To the contrary, in applying only Fourth Amendment rules/concepts, the CCOA applied "a rule that contradicts the governing law set forth in" those cases.  *House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008), quoting *Maynard v. Boone*, 468 F.3d 665, 669 (10th Cir. 2006).  Simply put, the CCOA did not address either prong of the *Strickland*/*Kimmelman* tests, which necessarily means that its decision is "contrary to" those decisions.  *See Cargle v. Mullen*, 317 F.3d 1196, 1202 (10th Cir. 2002) (deferential standard of review does not apply if the state court employed the wrong legal standard in deciding the merits of the federal issue).

The CCOA further contravened *Strickland* and *Kimmelman* by focusing its analysis *not* on the circumstances surrounding the pretrial conduct Miller challenged from "counsel's perspective *at the time*," but rather based only on facts "supported by the record," and how "the officer who searched [Leavitt] and the backpack testified" *at trial*.  *Miller II*, ¶¶ 24, 26. Obviously, the officer's trial testimony was not available to Miller's attorneys in the pretrial stage and had nothing to do with their decision-making process.  Nor could the purposed facts from trial be viewed in isolation without viewing them in conjunction with the facts alleged by Miller, some of which were outside the record, were not contradicted by the existing factual record, and, if true, entitled him to relief.  *Strickland* makes perfectly clear that a court hearing an ineffective assistance claim *must* consider the totality of the evidence presented in support of the claim, not simply the trial record that was before a reviewing court on direct appeal.  *See Strickland*, 466 U.S. at 687-90, 695; *see also Massaro*, 538 U.S. at 504-05 (recognizing that: (a) because "[t]he evidence introduced at trial … will be devoted to issues of guilt or innocence, … the resulting record in many cases will not disclose the facts necessary to decide either prong of the *Strickland* analysis;" (b) "[i]f the alleged error is one of commission, the record may reflect

27

the action taken by counsel but not the reasons for it;" (c) "[t]he trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them;" and (d) "[w]ithout additional factual development, … [a] court may not be able to ascertain whether the alleged error was prejudicial").

### 3.    Unreasonable Application

Assuming for argument's sake that the CCOA's perfunctory reference to *Strickland* at the outset of the Discussion section of its Opinion (*see Miller II*, ¶¶ 5, 8) is sufficient to survive the "contrary to" test, the CCOA nevertheless unreasonably applied *Strickland* to the facts of this case.

As a threshold matter, "the *Strickland* standard must be applied with scrupulous care." *Richter*, 562 U.S. at 105.  But as discussed above, the CCOA plainly did not do that here.  Again, although the CCOA generally identified the proper test for assessing a claim of ineffectiveness of counsel under *Strickland* — *i.e.*, that the petitioner must show both (1) constitutionally deficient performance, by demonstrating that his counsel's conduct was objectively unreasonable, and (2) resulting prejudice by demonstrating a reasonable probability that, but for counsel's unprofessional error(s), the result of the proceeding would have been different (*Strickland* at 687) — the CCOA did not actually apply or decide either *Strickland* prong; it instead decided Miller's *Kimmelman* claim without even acknowledging *Kimmelman* and based solely on its understanding of Fourth Amendment principles.

As to the grounds the CCOA did rely upon, it unreasonably applied *Terry* by impermissibly extending *Terry*'s reach on the basis that "the officer who searched [Leavitt] and the backpack testified at trial about his ongoing concern for himself and his partner's safety before and during their encounter with R.L." *Miller II*, ¶ 26.  In addition to relying on "the

distorting effects of hindsight," this reasoning ignores the requirement that the officer first conduct a limited pat-down search of the *exterior* of the backpack as a prerequisite before searching its *inside* compartments. Case precedents cited above (*see* § I.C.1.a, *supra*) emphasize the importance of this intermediate step and are dispositive on this issue. *See Terry*, 392 U.S. at 24, 30 ("a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him"); *Leo*, 792 F.3d at 749 ("[t]his limited protective search includes a *pat-down* of the suspect's effects, including a bag") (emphasis added).[5] Such a pat-down in this case would not have permitted further warrantless searching into the backpack.

### 4.    Unreasonable Fact-Finding

Finally, for reasons in addition to those already discussed, the CCOA also unreasonably determined the facts under *Strickland* and *Massaro*.

First, the state court process was defective in that Miller was never afforded a meaningful opportunity or evidentiary hearing to prove the facts supporting his claim. In Colorado, every person convicted of a crime is entitled as a matter of right to make an application for postconviction review. *See* C.R.S. § 18-1-410(1). Rule 35(c) of the Colorado Rules of Criminal Procedure implements this right and prescribes the procedural requirements that a person seeking

---

[5] Although the CCOA emphasized the fact that Leavitt was not formally arrested or handcuffed until after the backpack search, *see Miller II*, ¶¶ 24-25, that is hardly a dispositive fact, given the record facts outlined above which demonstrate the absence of any immediate threat to the officers or anyone else. And while the CCOA suggested that Miller's reliance on *U.S. v. Wills*, *supra*, "is misplaced," *Wills* itself refutes that suggestion. *Wills* did not hold "that the need for the protective search ended when the police arrested the defendant since he could no longer gain access to the contents of the backpack while the officers searched it." *Miller II*, ¶ 25. Rather, *Wills* held that when the officer failed to "first pat down the exterior of the backpack to feel for weapons" and instead "immediately unzipped" the backpack and "conducted a full-scale search of its contents," the officer "conducted a warrantless search that clearly 'exceeded the bounds of *Terry*.'" *Wills*, 316 F.Supp.3d at 444-45. This is almost exactly what happened here.

this relief must follow. *See People v. Weidemer*, 852 P.2d 424, 434 (Colo.1993). Under Rule 35(c), a criminal defendant will normally be given the opportunity to develop his ineffective assistance of counsel claims in an evidentiary hearing so that he can create a precise factual record that preserves the issues for further review. *See Ardolino v. People*, 69 P.3d 73, 77 (Colo. 2003). The rationale for this rule is that the district court is the forum best suited to develop facts necessary to determine adequacy of representation during an entire trial. *Id.*, citing *Massaro*, 538 U.S. 500. Here, by failing to properly apply *Strickland* and *Massaro*, the CCOA failed to provide the process dictated by federal law and therefore necessarily lacked the information required to apply the substantive elements of *Strickland* and *Kimmelman* in an informed, objectively reasonable manner, such that its findings resulted in an "unreasonable determination" of the facts. *See generally Smith v. Aldridge*, 904 F.3d 874, 882 (10th Cir. 2018) ("[T]he procedures a state court employs to make factual determinations — here, deciding whether to order an evidentiary hearing — can affect the reasonableness of the court's subsequent factual determinations. And sometimes, declining to hold an evidentiary hearing may so affect, and indeed infect, a state court's fact-finding process that it renders the court's factual determinations unreasonable."). Reasonable minds would agree that, at a minimum, the state courts needed to hold an evidentiary hearing in order to make the factual determinations necessary to determine Miller's *Kimmelman* claim here. *Id.*, citing *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).

Second, the CCOA never addressed or determined critical first-level facts, namely whether Miller's lawyers' failure to move to suppress the fruits of the backpack search was a matter of trial strategy or tactics, or instead resulted from ignorance and/or inattention. Rather than considering and deciding that threshold question, the CCOA instead skipped it entirely, fast-forwarding to what it perceived to be the guiding Fourth Amendment cases and reasoning that

the search was permissible as a protective search.  In so doing, the CCOA neglected to make the finding of facts upon which any meaningful *Strickland* determination must rest.  *Compare Rosales*, *supra*, at *2 (trial counsel testified that "he may have missed" the illegal entry issue and indicated his failure to do so was not a strategic decision made after a thorough investigation of law and facts, as *Strickland* requires).  In this situation, the CCOA's lack of factual findings is necessarily unreasonable and creates an analytical vacuum where there is nothing to which the presumption of correctness could attach.  *See Wiggins v. Smith*, 539 U.S. 510, 530 (2003) (no deference where "the state court made no such finding").

Third, as already described, the CCOA's factual findings were made under a misapprehension as to the correct legal standards and in reliance on trial testimony that did not exist at the time trial counsel's omission occurred.  This is legal error that fatally infected the fact-finding process, such that any resulting factual determinations are unreasonable (and no presumption of correctness can attach to them).

Finally, the CCOA's finding "[t]he backpack was within [Leavitt]'s reach," *Miller II*, ¶ 24, is clearly erroneous and thus unreasonable because there is no evidence in the record to support this finding.  *See* TR 4/12/13, pp.21-26, 39-45, 156-57 (by omission); *see also Smith*, 904 F.3d at 882 ("if a state court cites the record incorrectly — by saying, for instance, that someone gave testimony at trial when they, in fact, did not — this could constitute an unreasonable factual determination").

For all of these reasons, AEDPA deference is not appropriate.

### E.    Need for Evidentiary Hearing

Miller followed Colorado's procedures for seeking postconviction relief and, in so doing, diligently tried to develop the factual foundations of his *Kimmelman* claim when he was in state

court.  But the state courts rebuffed his efforts.  The CCOA denied his *Kimmelman* claim without ever applying *Strickland* or *Kimmelman*, and without making any factual findings sufficient to inform the applicable legal tests to assess his claim.  The CCOA has thus left this Court with only a cold record and no factual findings on either *Strickland* prong.  As such, Miller should be entitled to an evidentiary hearing.  *See Harris v. Sharp*, 941 F.3d 962, 982-83 (10th Cir. 2019); *Littlejohn v. Trammell*, 704 F.3d 817, 856 (10th Cir. 2013).

### F.    Conclusion

The merits of Miller's Sixth Amendment claim are substantial.  Petitioner requests an evidentiary hearing to develop the factual bases of his claims.  *See Harris v. Nelson*, 394 U.S. 286, 300 (1969) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry").

Ultimately, because the CCOA's judgment in *Miller II* was contrary to and an unreasonable application of *Strickland* and *Kimmelman*, this Court should grant Mr. Miller's application for writ of habeas corpus and vacate his convictions.

## II.    CLAIM TWO:  Mr. Miller is entitled to habeas relief because his federal constitutional rights to due process and a fair trial were violated by pervasive prosecutorial misconduct during the trial and throughout closing argument.

### A.    Preservation and Last Reasoned State Court Decision: *Miller I*

In his direct appeal, Miller raised and fairly presented a claim of "pervasive prosecutorial misconduct" during the trial and closing arguments, in violation of his federal constitutional rights to a fair trial and due process, citing, *inter alia*, the Sixth and Fourteenth Amendments, *Darden v. Wainwright*, 477 U.S. 168, 178-79, 181 (1986), and *Berger v. United States,* 295 U.S.

78, 88 (1935). *See* Appendix 2, pp.31-55, 69; Appendix 3, pp.16-31. As detailed below, the CCOA never actually addressed the federal constitutional claim presented as such, but rather simply measured the alleged error(s) exclusively under state case law. *Miller I*, ¶¶ 45-64. Miller later raised this same federal constitutional claim in his petition for a writ of certiorari to the CSC, *see* Appendix 5, pp.12-25, but the CSC declined to review the matter.

### B.    Additional Relevant Facts from Direct Appeal

Specifically, Miller alleged and complained about the following instances of prosecutorial misconduct, but the CCOA rejected his claims:

### 1.    Asserting in rebuttal closing argument that Miller was "lying all day. Lying, lying, lying…" and "can't keep it all straight."

During its rebuttal closing, the prosecution argued:

… what does Ryan Defendant tell Melanie King? Well, the police are there because of some restraining order thing. Really? You mean the restraining order that is in your cabinet in your living room that you have already been served with and are supposed to be in court today.

No, obviously that doesn't make any sense. But he is lying all day. Lying, lying, lying about where he has to be, where he has been, where he has to go. He can't keep it all straight.

TR 4/19/13, p.58.

The CCOA acknowledged that the prosecution's statements were "improper," but determined they were "not plain error" because the lying references were "confined to a single portion of rebuttal closing." *Miller I*, ¶ 50.

> 2. **Improperly asking a witness about invoking the Fifth Amendment and being "forced" to testify, improperly characterizing Miller's demeanor at counsel's table and using it as substantive evidence of guilt, misrepresenting the terms of the witness's immunity agreement, and opining that the witness "lie[d] and perjure[d] himself."**

An inmate at the Denver County jail, Eric Perez, told his probation officer and DPD that Miller had confessed the murder, but subsequently recanted the story as untrue and invoked his Fifth Amendment privilege. TR 4/17/13, pp.128-32. In exchange for Perez's agreement to testify truthfully, the prosecution granted him use immunity "other than a prosecution for perjury or false statements or otherwise failing to comply" with the immunity agreement and compelled him to testify. TR 4/17/13, pp.150-52; CF, pp.391-93. Perez told jurors he'd fabricated the story about Miller's confession to try to gain a reduced sentence, and that it wasn't true. TR 4/17/13, pp.162-91. Despite a direct examination in which the prosecution elicited that Perez neither asked for nor received any benefit for the information, that he never previously mentioned hearing about Miller's case in the news, that it was alienating and dangerous to be a "snitch" in prison, and even that "being a snitch" was one reason he was changing his story, although it was mainly because it was a lie, the prosecution nevertheless asked him:

> Q. Just so we're clear, Mr. Perez, you attempted today to assert your Fifth Amendment privilege; is that correct?
>
> A. Yes, ma'am.
>
> Q. You were concerned about the statement that you gave may be used against you in some way?
>
> A. Yes, ma'am.
>
> Q. You were provided -- you actually had to be sort of forced to testify by being given immunity?
>
> A. Yes, ma'am. I didn't want to testify.

34

TR 4/17/13, pp.175-76.

Later, in rebuttal closing, the prosecutor argued that Perez "wanted Ryan Miller to believe that he wasn't going to talk against him," and:

> Did you see the little head nods between them when they left and the smirking that was going on? And Eric Perez had immunity from his testimony so he knew he could sit up there and lie and perjure himself.

TR 4/19/13, p.73.

Miller maintained that it was plainly improper and an obvious constitutional error to elicit Perez's Fifth Amendment invocation to impeach him and to prove Miller's guilt, and that the prosecution had impermissibly injected personal opinions of credibility or guilt, misstated the evidence, and misled the jury about inferences it may draw. *See* Appendix 2, pp.31-32, 37-41, 69 & Appendix 3, pp.19-21, citing, *inter alia*, *Namet v. United States,* 373 U.S. 179, 186-87 (1963) (the prosecution may not call a witness whom he knows will invoke the Fifth Amendment, or use such invocations for guilt); *Griffin v. California,* 380 U.S. 609, 614-15 (1965) (emphasizing that the Fifth Amendment "outlaws comment" on the refusal to testify because it "cuts down on the privilege by making its assertion costly"); *United States v. Young,* 470 U.S. 1, 18-19 (1985) (a prosecutor's credibility opinions are particularly misleading and prejudicial and "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence"), citing *Berger*, 295 U.S. at 88-89.

The CCOA determined that "not every reference to a witness's assertion of Fifth Amendment privilege is error requiring reversal," that because Perez and Miller "were not Codefendants, … any hypothetical connection between his responses to the questions and [Miller's] guilt was too tangential to require the trial court sua sponte to intervene and strike the testimony," that "it was incorrect to state that the use immunity permitted Perez to lie on the stand," and that it was "aware of no authority holding that it is proper to comment on the demeanor of a defendant seated at a defense table in cases where the defendant does not testify." *Miller I*, ¶¶ 42-44, 51-52. Nevertheless, as to the latter items, it determined "the statements were brief" and did "not warrant reversal as plain error." *Id.*, ¶¶ 44, 52.

### 3.    Improperly bolstering Leavitt's testimony in rebuttal closing with facts not in evidence.

In rebuttal closing, the prosecutor argued Leavitt was "a despicable human being" who "is going to serve 16 to 48 years in prison and he deserves every minute of 48 years. *And will get [no] and has not gotten any leniency for his part in testifying,* in making his statement other than the fact he is not facing life." TR 4/19/13, p.69 (emphasis added). Miller asserted that this comment misrepresented the facts and misled the jury, given that Leavitt obviously hoped for a lower-end sentence, and the prosecution did not know — and could not have known — that Leavitt "will get" no leniency, since the court might view his cooperation as mitigating. *See* Appendix 2, pp.45-46 & Appendix 3, pp.23-24.

The CCOA characterized the prosecution's statement as a response to defense counsel's arguments attacking Leavitt's motives, and therefore its comment "was within the prosecutor's wide latitude to respond to defendant's closing argument." According to the CCOA, "the prosecutor's reference to leniency would have been understood by the jury to refer to leniency

from the prosecution, not the court," and "[t]he statement was in any event not flagrantly, glaringly, or tremendously improper." *Miller I*, ¶¶ 53-54.

> ### 4. Misrepresenting evidence, misleading the jury, and encouraging jurors to draw improper inferences.

An expert for the prosecution testified there was DNA consistent with both Miller and Leavitt on the gun (with the major sample matching Miller), and there was a 1 in 650 quadrillion chance that a random person deposited the major sample. TR 4/17/13, pp.98, 107. In rebuttal closing, however, prosecutor told jurors:

> But one in 650 quadrillion *tells you that Ryan Miller was holding that gun. That Ryan Miller shot [A.R.].*

TR 4/19/13, p.76.

> The prosecutor also asserted in rebuttal closing that:

> What did the witnesses hear Ryan Miller saying in there. I love you while he is throwing her against the walls. How come you are doing this to us? Why are you doing this to us? What does that tell you about Ryan Miller?

TR 4/19/13, p.54. Miller argued that this misrepresented evidence (no one heard "I love you;" only one person heard "why are you doing this to us"), and impermissibly encouraged the use of character for guilt. *See* Appendix 2, pp.46-49 and Appendix 3, pp.25-29, citing, *inter alia*, *Old Chief v. United States,* 519 U.S. 172, 179-80 (1997).

The prosecutor also told the jury "a number of people testified" Miller is "very manipulative" and Leavitt's accusation was corroborated by "[a]ll [of the] things that cannot be manipulated by Ryan Miller." TR 4/19/13, pp.62, 70. But Leavitt was the *only* person who called Miller "manipulative," and Miller maintained that this was simply another bad-character-for-guilt argument.

The CCOA gave Miller's arguments short shrift, determining that although "[s]ome of the prosecutor's characterizations of the evidence during closing argument were not exact descriptions of what was introduced at trial," most of the statements "were reasonable inferences from the evidence," and, "[t]o the extent they went beyond reasonable inferences and instead misstated evidence, they were improper, … but they were not plain error." *Miller I,* ¶¶ 53-58.

### 5. Seeking to inflame sympathy for the victim and improperly calling her "brave" and "courageous" for accusing Miller.

After arguing the victim "did everything right" and was afraid for her life (TR 4/19/13, pp.54-55), the prosecutor added:

> And he shot her in the head one time.  And … police … found that brave, beautiful, smart, courageous woman slumped over in her car with her blood on her Project Safeguard paperwork.

TR 4/19/13, p.77.  Miller argued on direct appeal that these arguments were calculated to inflame sympathy and divert the jury from objectively deciding the case on the evidence, and that they sought to impress upon the jury the prosecutor's conviction as to Miller's guilt.  *See* Appendix 2, pp.50-51.

The CCOA rejected this argument, concluding that the prosecution's reference to the victim as being "brave" and "courageous" was "a fair inference from evidence of her efforts to resist defendant by seeking a restraining order and bringing charges," and "did not amount to an improper appeal for sympathy." *Miller I,* ¶ 59.

### 6. Shifting the burden to prove the defense theory and implying it was brought in bad faith.

In closing argument, the prosecution addressed Miller's theory of defense instruction as follows:

> … this is not an instruction from the judge.  Be clear about this.  This is the defendant's theory of his case.  His theory.....
>
> And square that with your commonsense.  Think back to reasonable doubt.  Was there a shred of evidence in this case that this defendant was anywhere else … at the moment Andrea Roan was shot in the head?  Absolutely not.  Nothing was introduced to show that.
>
> It's the defendant's position that evidence was introduced that Richard Leavitt acting alone committed this crime.  Square that with your commonsense.  Was there anything, anything in this case that indicated Richard Leavitt acted alone?  And why would he have to act alone… Think back to that complicity theory.
>
> Because if Ryan Miller knew for one minute, if he helped him for one second, … he's as guilty as whoever pulled that trigger.  That's why the defendant's theory has to be that Richard Leavitt acted alone in this case.  Think about that.

TR 4/19/13, pp.12-13.

Miller maintained these arguments impaired his presumption of innocence, shifted the burden of proof by suggesting he had a duty to prove his theory, and implied his theory was brought in bad faith and that his own counsel did not believe in his innocence, in violation of his Sixth and Fourteenth Amendment rights.  *See* Appendix 2, pp.51-53.

The CCOA simply disagreed: "The prosecutor was entitled to point out that the instruction set forth defendant's theory" and "to argue why that theory was implausible."  *Miller I*, ¶ 60.

### 7.        Cumulative effect of the misconduct.

Miller maintained that the cumulative effect of the misconduct he pointed to required reversal.  *See* Appendix 2, pp.53-55, citing, *inter alia*, *Berger*, 295 U.S. at 78, 88, *Darden*, 477 U.S. at 168, 181, and U.S. Const. amends. VI & XIV; *see also* Appendix 3, pp.30-32.

The CCOA denied Miller's claims without addressing the federal constitutional issue he presented, concluding: "some of the prosecutor's comments were improper, and we do not

condone them.  However, when considered in context and in light of the overwhelming evidence

of defendant's guilt, they do not — even if considered cumulatively — rise to the level of plain

error."  *Miller I*, ¶ 61.  In reaching this determination, the CCOA relied on what it believed to be

the strength of the evidence:

> The prosecution presented significant physical evidence and testimony of disinterested witnesses to establish that defendant assaulted and later killed the victim.  As discussed above, neighbors called the police when they heard the altercation in the victim's apartment on December 3, and the victim told the police and her mother that defendant was the assailant.  As for the murder, defendant was the major contributor of DNA found on the murder weapon.  A neighbor who heard the gunshot saw a man running from the scene, wearing clothes that matched clothes subsequently identified as defendant's — including sweatpants that tested positive for gunshot residue.  Cell phone records also placed defendant near the victim's apartment at the time of the murder.

> Richard Leavitt's testimony regarding the planning and execution of the murder plot was consistent with the other witnesses' testimony and with the physical evidence.  Defendant's theory was that Leavitt had acted alone; however, there was no evidence that Leavitt had a motive to kill the victim, and ample evidence from which the jury could have concluded that defendant had such a motive.  Finally, even if Leavitt fired the shot that killed the victim, defendant could still be found guilty of murder as a complicitor, and the jury was so instructed.

> In these circumstances we cannot say that any prosecutorial misconduct so undermined the fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.

*Miller I*, ¶¶ 62-64.

### C.    Legal Discussion

The CCOA never actually addressed the federal constitutional issue presented.  Indeed,

apart from a single reference to *Namet*, the CCOA did not apply or even cite any controlling

United States Supreme Court precedent or the Sixth or Fourteenth Amendments.  As such, Miller

respectfully maintains that AEDPA deference is not warranted, this Court should exercise its

independent judgment in deciding the Fourteenth Amendment claims, and he should be entitled

"to an unencumbered opportunity to make his case before a federal judge." *Battenfield*, 236 F.3d at 1220; *see also Hooks*, 689 F.3d at 1163-64; *Cargle*, 317 F.3d at 1202; *Johnson*, 568 U.S. at 302-03. Alternatively, the CCOA unreasonably applied clearly established federal due process precedents.

The Supreme Court has clearly established that prosecutorial misconduct can violate a defendant's right to due process and a fair trial. In *Greer v. Miller*, 483 U.S. 756 (1987), the Court described how "prosecutorial misconduct may so 'infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* at 765, quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainright*, 477 U.S. 168, 181 (1986) ("The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"), quoting *Donnelly*, 416 U.S. at 643; *Caldwell v. Mississippi*, 472 U.S. 320, 338-40 (1985).

It is likewise clearly established that prosecutorial misconduct during closing argument — including "misstating the facts in his cross-examination of witnesses," "improper suggestions," and "insinuations" — requires a new trial, at least where the prosecution's case is not strong:

> The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor — indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
>
> It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be

faithfully observed.  Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.  The court below said that the case against Berger was not strong; and from a careful examination of the record we agree.  Indeed, the case against Berger, who was convicted only of conspiracy and not of any substantive offense as were the other defendants, we think may properly be characterized as weak — depending, as it did, upon the testimony of … an accomplice with a long criminal record.

In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence.  If the case against Berger had been strong, or, as some courts have said, the evidence of his guilt "overwhelming," a different conclusion might be reached.  Moreover, we have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential. A new trial must be awarded.

*Berger*, 295 U.S. at 88-89 (citations omitted).

Applying this constitutional framework here leads to the opposite conclusion reached by the CCOA and, at best, the CCOA unreasonably applied the governing precedents.  The prosecution's misconduct was pervasive and the CCOA found and/or assumed several improprieties.  To recap the many forms the misconduct took:

Prosecutors told the jury that Miller was "lying all day.  Lying, lying, lying" and "can't keep it all straight," and that Perez "lied" and "perjured himself."  This was extremely improper because it is well-established that assessing a witness's credibility is the jury's exclusive province and that plain error often occurs when those boundaries are crossed.  *See U.S. v. Hill*, 749 F.3d 1250, 1260-61 (10th Cir. 2014); *U.S. v. Charley*, 189 F.3d 1251, 1261 1267 (10th Cir. 1999); *U.S. v. Starks*, 34 F.4th 1142, 1173 (10th Cir. 2022).

The prosecution elicited that Perez had invoked his Fifth Amendment privilege to try to protect Miller and that he was being forced to testify, and further misrepresented that his immunity agreement allowed him to lie.  These tactic runs afoul of *Namet,* which establishes

that, although reversible error is not "invariably committed whenever a witness claims his privilege not to answer," such error may occur when (1) "the Government makes a conscious and flagrant attempt to build its case out of inferences arising from the use of testimonial privilege," or (2) when the "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudice the defendant." 373 U.S. at 186-87. Here, the prosecution purposefully drew jurors' attention to Perez's invocation of his Fifth Amendment rights and mischaracterized the immunity agreement in order to impeach him and to suggest that his trial testimony was untrue, that he was now lying to jurors and perjuring himself, and that his earlier statements implicating Miller were the truth.

The prosecutor personally attested to Miller's alleged demeanor and used it for guilt. This was blatantly improper under *Young*, 470 U.S. at 18-19, and a multitude of other cases. *See U.S v. Wright*, 489 F.2d 1181, 1186 (D.C. Cir. 1973) (defendant's "courtroom behavior off the witness stand" is in no "sense legally relevant to the question of his guilt or innocence of the crime charged," and "[t]his basic principle cannot be circumvented by allowing the prosecutor to comment on the character of the accused as evidenced by his courtroom behavior"); *U.S. v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) (reversing on improper argument: "You saw him sitting there in trial. Did you see his leg going up and down? He is nervous. (objection overruled.) … Do you think he is afraid?"); *U.S. v. Carroll*, 678 F.2d 1208, 1209-10 (4th Cir. 1982) (improper to describe non-testifying defendant's courtroom behavior and suggest its use for guilt); *U.S. v. Schuler*, 813 F.2d 978, 980-82 (9th Cir. 1987) (absent a curative instruction, comments on defendant's off-stand behavior violate due process).

The prosecutor bolstered Leavitt with the false assurance that he "will not" receive any leniency for his testimony, which invoked the imprimatur of both the prosecutor's office and the court.  In the words of the Tenth Circuit Court of Appeals:

> Several important considerations explain the universal denunciation of this type of argument.  As the State's official representative prosecuting the case on the public's behalf, the prosecuting attorney carries a special aura of legitimacy about him.… Thus, the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own.…  Further, the prosecutor's personal experience in criminal trials may induce the jury to accord unwarranted weight to [his opinions regarding the defendant's guilt]….  Finally, the jury might think that the prosecutor's opinion is based on evidence beyond that presented at trial.

*Cargle*, 317 F.3d at 1218 (cleaned up; citations omitted); *see also U.S. v. Smith*, 962 F.2d 923, 936 (9th Cir. 1992) (reversing where prosecutor not only vouched for prosecution witness but "invoked the integrity of the court" and thus "placed the imprimatur of the judicial system itself on [the witness's] testimony*"); U.S. v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994) (argument that "placed the prestige of the government, and even of the court, behind the credibility" of prosecution witnesses was improper).

Finally, the prosecutor misrepresented evidence and misled the jury about the inferences it could properly draw, including using bad character evidence and the victim's alleged fear to establish guilt.

The cumulative effect of these repeated instances of misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process.

In denying Miller relief under Colorado's plain error standard (despite acknowledging a number of improprieties), the CCOA relied heavily on what it perceived to be "overwhelming evidence of" Miller's guilt.  *See Miller I*, ¶¶ 61-64.  But, as explained above, the case against Miller was far from ironclad and not nearly as strong as CCOA described in denying Miller's

44

claims. Miller did not confess to police, and no physical evidence placed him at the scene of the crime. His alibi — namely, that he was dropping his car off early that morning at Paddock's Garage to get a window replaced (*see*, *e.g.*, TR 4/15/13, pp.22-27; TR 4/16/13, pp.40-42; TR 4/17/13, pp.232, 244-47, 253) — raised substantial questions about the prosecution's timeline and Miller's presence.

The prosecution's cellphone expert, DPD Detective Alphonso Cervera, testified that both Leavitt and Miller's cell phones were pinging towers in locations that were consistent with their presence at the murder scene. TR 4/17/13, pp.207-54. On cross-examination, however, he was forced to concede that cell phones don't always connect to the nearest cell tower; geography, urban structures, rush hour, and call volume can impede that connection; cell site and call records analysis is "not an exact science;" and that the map he presented to the jury omitted certain calls/data from the morning of the murder. TR 4/18/13, pp.2-6, 26-32, 37, 39. In particular, his PowerPoint presentation omitted the compelling fact that Miller's phone pinged a tower near the victim's apartment at 6:54 and 6:59 a.m. on the morning of the homicide, when Miller was undisputedly across town, even though it was a 7:19 a.m. ping to that same tower that supposedly put his phone near the murder scene. TR 4/18/13, pp.30-32. He also conceded that the morning of the murder was a high-volume period, and the critical 7:19 a.m. ping could have originated from Miller's apartment. *Id.*, pp.41-42.

Inmate Perez, who initially claimed to DPD that Miller had confessed the murder, subsequently recanted the story and testified that it was fabricated and untrue and originally offered to try to benefit himself. TR 4/17/13, pp.162-91.

Thus, the prosecution's case against Miller for murder hinged mostly and in many ways on Leavitt, who initially denied involvement and gave contradictory accounts in three interviews

played for the jury. *See, e.g.*, TR 4/15/13, pp.144-52, 163-79; TR 4/16/13, p.29; CF, pp.88-104. After police confronted Leavitt with the fact that his DNA was on the murder weapon, he negotiated a plea deal with his proffer that: Miller had him obtain the gun, bring it to Denver on the morning of the murder and drive Miller behind the victim's apartment, where he supposedly donned baggy over-clothes and got out as Leavitt waited in his Audi; Leavitt heard a gunshot; Miller returned; they went back to Miller's apartment, got Miller's vehicle and dropped it at Paddocks Garage to have a window repaired and returned to Miller's residence; and Miller then gave him a backpack and sent him to a car rental. TR 4/15/13, pp.144-52, 163-79; TR 4/16/13, pp.3-23; *see also* Defense EXs B-E (at Exhibits.pdf, pp.625-45); CF, pp.88-108.

As discussed above, Santerre — the only eyewitness with a good opportunity to see the suspect — described a man without facial hair, wearing a dark hooded black or grey sweatshirt, dark pants and a brown "wool knit winter hat" with "a brim," who ran to "a "silver Audi" and got into the *driver's* side — a description that matched Leavitt, not "scruffy beard[ed]" Miller. TR 4/11/13, pp.111-17, 138-41, 145-46; TR 4/19/13 pp.31-33; CF, pp.214-15; TR 4/16/13, p.80; Exhibits, pp.40-41 (2/17/12 PH PPL Ex.21). Of course it was Leavitt who owned a silver Audi, confessed that he and his Audi were at the murder scene, and was stopped with the murder weapon in his possession. TR 4/11/13, pp.272-73, 276; TR 04/15/13 p. 61, 100-111; 4/16/13, pp.CF 88-89, 216-19, 319. DNA matching both Leavitt and Miller was on that handgun. TR 4/17/13, p.98; TR 4/12/13, p.162. A baggie of live rounds matching the shell casing at the scene was in the driver's door of Leavitt's Audi. TR 4/12/13, p.104; TR 4/17/13, p.31.

Leavitt's credibility was highly suspect. He clearly and admittedly had strong motive to implicate Miller, and he lied so frequently and continuously to try to benefit himself that prosecutors ultimately were forced to concede that he was a liar and "a despicable human being,"

while arguing that he "finally" told "the truth" only when faced with first-degree murder charges. TR 4/15/13, pp.144-53, 169-79; TR 4/16/13, pp.4-23; TR 4/19/13 pp.69-71.[6]

At trial, Leavitt testified — in exchange for dismissal of first-degree murder and accessory charges, a plea to second-degree murder, and use immunity — consistently with much of his proffer, as required by his plea agreement, that Miller planned to and did kill the victim, and supposedly admitted as much to Leavitt. *See*, *e.g.*, TR 4/15/13, pp.37-179; TR 4/16/13, pp.3-29; CF, pp.386-87; Defense EXs D & E (at Exhibits.pdf, pp.635-44). Leavitt was told the prosecution would withdraw the deal if he deviated from his proffer. Defense EX D, p.4 (at Exhibits.pdf, p.640); *see also* TR 4/16/13, pp.3-23.

Based on all of the foregoing, Miller respectfully submits that the prosecutorial misconduct that occurred in this case so infected his trial with unfairness as to make the resulting conviction a denial of due process.

### D.      Harmful Error under *Brecht*

Even where, as here, a habeas petitioner proceeding under 28 U.S.C. § 2254 establishes a due process violation under *Darden* and its progeny, a writ of habeas corpus generally may not be granted unless the found constitutional error is also determined to have "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Fry v. Pliler*, 551 U.S. 112, 116, 121-22 (2007), quoting *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993); *see also Brown v. Davenport*, 596 U.S. 118, 122, 134 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* and the one Congress prescribed in AEDPA.").

---

[6] At Leavitt's sentencing, which occurred after Miller's trial, the prosecution, seeking a maximum sentence, went to great lengths to emphasize how just frequently Leavitt lied. CF, pp.714-24.

Miller here argues that AEDPA deference is not appropriate because the CCOA never addressed his federal constitutional claim — *i.e.*, the denial of due process under *Darden* — on its merits. Assuming *arguendo* that this Court reaches a different conclusion, then Miller must also meet the *Brecht* standard. Miller respectfully submits that the prosecutorial misconduct herein had substantial and injurious effect or influence in determining the jury's verdict. As discussed in the previous subsection, the prosecution's misconduct was widespread, and the evidence in the case was not so strong as to immunize it from the harmful effects flowing from that misconduct. At a minimum, the prosecution's misconduct could have tipped the balance and thus should cause this Court to have a "grave doubt" about the effect of the error on the jury's verdict. "Grave doubt" exists where the issue of harmlessness is "so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *Douglas v. Workman,* 560 F.3d 1156, 1171 (10th Cir. 2009).

### E.    Conclusion

For all the reasons discussed, Miller's convictions were obtained in violation of his federal constitutional rights to due process and a fundamentally fair trial. U.S. Const. amends. VI, XIV.

Petitioner has stated meritorious Sixth and Fourteenth Amendment claims and shown a basis for federal habeas relief. The Court should grant federal habeas relief and vacate his convictions.

## RELIEF REQUESTED

Petitioner Miller respectfully requests that this Court grant his application for writ of habeas corpus and set aside his unconstitutional convictions. He seeks an evidentiary hearing to develop the factual bases of his ineffective assistance of counsel claim.

Respectfully submitted this 21st day of January 2026.

/s/ Jonathan D. Reppucci

Jonathan D. Reppucci
Reppucci Law Firm, P.C.
1544 Race St.
Denver, CO 80206
Telephone: (303) 333-5166
Email: jiccupper@gmail.com

Attorney For Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **APPLICATION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 AND SUPPORTING ARGUMENT** with the Clerk of the Court using the CM/ECF system which may send notification of such filing to the below email address. I am also sending a copy via email copy to the following on this 21st day of January 2026:

Colorado State Attorney General
Attn: Brenna A. Brackett
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 9th Floor
Denver, CO 80203
brenna.brackett@coag.gov

/s/ Jonathan D. Reppucci
Jonathan D. Reppucci